UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENT WILLIAM BOGSETH,

Petitioner,

v.

SHERRY BURT,

Respondent.

Case No. 1:20-cv-977

Honorable Sally J. Berens

**OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. The parties have consented to the conduct of all proceedings in this case, including entry of a final judgment and all post-judgment motions, by a United States Magistrate Judge. (ECF Nos. 19, 21.) Petitioner Brent William Bogseth is incarcerated with the Michigan Department of Corrections at the Muskegon Correctional Facility in Muskegon Heights, Muskegon County, Michigan.

On October 7, 2020, Petitioner filed his habeas corpus petition raising eight grounds for relief, as follows:

I. Was the evidence insufficient to support the conviction for first-degree murder in violation of the United States Constitution Amendments V, XIV.

II. Should the Petitioner's conviction be vacated and a new trial granted because the trial court's erroneous admission of the hammer as demonstrative evidence over defense counsel's objections constituted clear error and the trial judge's limiting instruction was insufficient to remove the unfair prejudicial effect of the hammer? In the alternative, was the petitioner's trial counsel constitutionally ineffective in failing to properly object to the introduction of the hammer?

III.     Was there a violation of the Petitioner's United States Constitution
         Amendment IV right, and was that evidence erroneously admitted at trial?

IV.      Was the ineffective assistance of counsel a violation of the Petitioner's
         United States Constitution Amendment VI right?

V.       [Did] the prosecutorial misconduct result[] [in] a denial of a fair trial for
         the Petitioner and a violation of his constitutional rights?

VI.      Was the verdict against the great weight of the evidence?

VII.     Was the arrest of the Petitioner prior [to] positive identification of the
         victim, and defects in the extradition hearing and sufficiency of papers a
         due process violation?

VIII.    Were the jury instructions faulty resulting in a due process violation?

(Pet., ECF No. 1-1, PageID.18–38.)  Petitioner was permitted to amend his petition to include an

additional issue:

IX.      Ineffective assistance of appellate counsel[] where[] appella[te] counsel
         was ineffective [for] failing to raise on defendant-appellant's right to
         appeal, ineffective assistance of counsel [for] the failure to challenge the
         defendant-appellant's extradition.   The defendant-appellant alleges the
         error is a jurisdictional structural defect.

(Pet'r's Mot. to Amend, ECF No. 9, PageID.180.)  Respondent has filed an answer to the petition

(ECF No. 8) stating that the Court should deny relief with regard to each of Petitioner's habeas

grounds for one or more of the following reasons: failure to exhaust state court remedies,

procedural default, noncognizability, and lack of merit.   In reply, Petitioner has voluntarily

dismissed claims III, VI, VII, VIII, and IX.   (Pet'r's Reply Br., ECF No. 16, PageID.2439.)

Therefore, only grounds I, II, IV, and V remain.   Upon review and applying the standards of the

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214

(AEDPA), the Court finds that the grounds are either not cognizable on habeas review, or they

lack merit.  Accordingly, the Court will deny the petition.

## Discussion

### I. Factual allegations

Petitioner is incarcerated for the premeditated and deliberate killing of his wife. Petitioner contests that the prosecutor presented sufficient evidence to support the verdict. He contends that a determination that the killing was premeditated or deliberate is nothing more than rank speculation. The Michigan Court of Appeals concluded otherwise. That court recounted the testimony elicited at trial in detail and posited certain inferences—inferences that the appellate court characterized as reasonable—that supported a finding that the killing was deliberate and premeditated. Although Petitioner challenges the court of appeals' characterization of the inferences as reasonable, he does not challenge the court's description of the evidence elicited at trial. Moreover, "[t]he facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).

Petitioner's challenge to the sufficiency of the evidence will require an in-depth examination of the trial testimony. For purposes of background, however, a simpler account will suffice. Petitioner picked up his wife from their home on the morning of September 1, 2015, to bring her to work. As far as the investigating officers could determine, no one saw her after that. She never arrived at work. Her partially buried body was found a week later. She had suffered multiple blows to the head that were consistent with the injuries one might expect from an instrument such as a claw hammer.

After hearing testimony for five days, the jurors deliberated for about a day before returning their verdict. Petitioner appealed his conviction to the Michigan Court of Appeals. In the brief he filed with the assistance of counsel, he raised two issues (Pet'r's Appeal Br., ECF No. 14-14, PageID.1794), the same issues he raises as habeas grounds I and II in this Court.

Petitioner also filed a *pro per* supplemental brief raising multiple issues, including the issues he raises as habeas grounds IV and V in this Court.  (Pet'r's *Pro Per* Suppl. Br., ECF No. 14-14, PageID.1843.)   On February 13, 2018, the Michigan Court of Appeals issued an opinion rejecting Petitioner's challenges and affirming the trial court.  (Mich. Ct. App. Op., ECF No. 14-14, PageID.1717–1731.)

Petitioner then filed a *pro per* application for leave to appeal to the Michigan Supreme Court raising five issues, including the matters raised in habeas grounds I, II, IV, and V, herein. That court denied leave by order entered December 4, 2018.  (Mich. Order, ECF No. 14-16, PageID.2228.)   Thereafter, Petitioner filed a petition for writ of certiorari in the United States Supreme Court.  The Supreme Court denied the petition by order entered April 15, 2019.  (Corr., ECF No. 14-16, PageID.2229.)

On July 30, 2019, Petitioner filed a motion for relief from judgment in the trial court. (Van Buren Cnty. Cir. Ct. Docket Sheet, ECF No. 14-1, PageID.322.)   The trial court denied relief initially by order entered September 9, 2019 (Van Buren Cnty. Cir. Ct. Op. & Order, ECF No. 14-15, PageID.1905–1923, 2056), and on reconsideration by order entered October 3, 2019 (Van Buren Cnty. Cir. Ct. Op. & Order, ECF No. 14-15, PageID.1924–1925).   Petitioner raised new claims in his motion, but he also reiterated the claims he had raised on direct appeal, including the claims raised in habeas grounds I, II, IV, and V in this Court.  With regard to the reiterated claims, the trial court denied relief under Michigan Court Rule 6.508(D)(2), because the issues had already been decided against Petitioner on direct appeal.  Petitioner sought leave to appeal the trial court's decisions in the Michigan Court of Appeals and the Michigan Supreme Court.  Those courts denied leave by orders entered March 3, 2020, and September 29, 2020,

respectively.  (Mich. Ct. App. Order, ECF No. 14-15, PageID.1902; Mich. Order, ECF No. 14-17, PageID.2419.)  A week later Petitioner timely filed his habeas petition.

## II.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693–94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the

Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state

appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–47 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

**III. Sufficiency of the evidence**

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency claims: the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality,

but not the sufficiency of the government's evidence.  *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002).  The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).  This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds.  *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals applied the following standard to resolve Petitioner's sufficiency challenge:

> The Court reviews a challenge to the sufficiency of the evidence by examining the "record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt."  *People v. Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1717.)  Although the appellate court cited state court authority for the standard, the standard applied is identical to *Jackson* and, if one looks to *Roper* and the case *Roper* cites in support of the standard, etc., eventually the source of the standard is identified as *Jackson*, *see People v. Hampton*, 285 N.W.2d 284, 286–87 (Mich. 1979).  Thus, there can be no question that the state court applied the correct standard.

After stating the appropriate standard, the court of appeals followed it. The court identified the essential elements of first-degree murder, focusing on the element of premeditation.[1] (Mich. Ct. App. Op., ECF No. 14-14, PageID.1718–1719.) The court then reviewed the record evidence in a light most favorable to the prosecution. Petitioner does not take issue with the court's statement of the evidence; rather, he challenges the inferential leaps the court of appeals concluded the jurors might have reasonably made from the evidence to find beyond a reasonable doubt that Petitioner had premeditated the killing of his wife.

The appellate court's analysis unquestionably depended on inferential leaps. *Jackson* contemplates that jurors are free to make such inferences—if they are reasonable. There is simply no way to assess the reasonableness of those leaps, individually or in combination, without recounting the appellate court's analysis in its entirety:

> A rational jury could conclude from the testimony about the state of Kim's remains that the person who killed her had to have taken some time to strip her, wrap her in plastic bags, and relocate the remains from the location of the murder to the wooded area where the remains were found. It could further infer that Kim's killer had to have performed these activities before the evening of September 3, 2015, which testimony established was the earliest point that the insect activity would have begun. The jury could then find that the insect activity did not occur because her remains were either sealed in some way or masked by chemicals after she was killed. Once the jury made the inference that the insect activity had been prevented in some way and that Kim's killer must have taken some time to cover up the crime and relocate her remains, it could conclude that she must have been killed earlier than the evening of September 3, 2015. It could also find that the start of the insect activity corresponded to the time when her

[1] The court of appeals' statement of the elements, including premeditation, and what is required to demonstrate those elements are purely matters of state law. It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The Sixth Circuit has, therefore, recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

remains were deposited in the woods, which also corresponded to the time period when Bogseth took the latter half of the day off from work.

The jury heard evidence that Kim abruptly and uncharacteristically ceased to participate in her normal activities by 11:38 a.m. on September 1, 2015. Her manager testified that Kim was a good employee who seemed to like her work and did not normally miss work. There was also testimony that she had been called in to work early and had made arrangements to be there, which suggested that she had no intent to miss work. Despite her plans and her work history, Kim failed to show up for work on September 1, 2015, and no one was able to contact her about her absence. Kim was also a heavy cell phone user, yet her cell phone ceased to send messages as of 11:38 a.m. on September 1, 2015. Laura Lee Adams testified that she was close to Kim and spent a significant amount of time with her. Adams said that Kim's last text message at 11:38 a.m. was uncharacteristic, and she suspected that a subsequent Facebook post purporting to be from Kim was not in fact from her given the flippant nature of the communication and the use of emoticons that Kim had never used before. Adams also testified that Kim was devoted to her son and would not have abandoned him. Kim had also expressed concern to Adams about the custody of her son now that she was going to divorce Bogseth, which was inconsistent with abandoning him in Bogseth's care. Brink too testified that Kim had been worried about what her friends thought of her and had stated her concern about preserving her friendship with Brink.

A reasonable jury considering this evidence could find that Kim failed to show up to work by around 11:00 a.m. and ceased communicating with her friends and family at around the same time because she was incapacitated. The jury could also infer from Adams's testimony that the last message that was sent from Kim's cell phone was made by someone other than Kim. When considered with the forensic evidence, the jury could reasonably find that Kim was already dead by the time the last text message was sent from her phone at 11:38 a.m. on September 1, 2015.

Jon Evans testified that he and his family lived in the same home as Bogseth and his family. He testified that Bogseth picked up Kim to take her to work at around 10:40 a.m. on September 1, 2015. Brink testified that he was communicating with Kim at that time, and she told him that Bogseth had arrived to take her to work. Additionally, Bogseth's employer testified that Bogseth texted him and stated that he needed to pick up his wife and take her to work at around the same time. Bogseth also admitted to officers on two separate occasions that he picked up his wife from their home at around 10:40 a.m. on September 1, 2015. Thus, there was evidence that Bogseth was the last person to be with Kim before her death, which the jury could have reasonably found occurred shortly thereafter.

There was also testimony and evidence that Bogseth had a fairly uncommon hammer that he routinely kept in his tool bag in his SUV, that that hammer was missing when his SUV and home were searched within a short time after Kim's

disappearance, and that he might have taken a replacement hammer from his employer's tool shed.  The evidence also showed that Kim was bludgeoned to death and that her injuries were consistent with the murder weapon being a claw hammer.  Further, as already observed, there was evidence that Kim was a heavy cell phone user and that her cell phone was used to send an uncharacteristic text message to Adams at 11:38 a.m., but no more messages after that.  There was also evidence that Bogseth called Adams at around that time and made statements to her that caused Adams to text Kim, which in turn set the stage for the uncharacteristic text.  Officers later discovered Kim's phone in an envelope that arrived at Bogseth's home after Kim's disappearance.  The envelope was found in a CD case that was similar to the one Kim usually brought to work and was seized from Bogseth's SUV.

A rational jury could find from this evidence that Bogseth took the phone and CD case from Kim around the time he picked her up to take her to work.  It could also infer that he used her phone to send the uncharacteristic text message to Adams after he called Adams and that he did so to create a plausible explanation for Kim's disappearance.  Adams's testimony that she had seen a Facebook message that was purportedly from Kim on September 2, 2015, but that she did not believe it to be from Kim, also fit this scheme.  Adams stated that the message related that Kim had run off to California with a trucker on a whim—leaving behind her friends, her family, and her young son.  Thus, there was evidence that Bogseth had taken Kim's phone and used it and other media to convey messages that would explain Kim's sudden disappearance and that he had done so by at least 11:38 a.m. on September 1, 2015.  Those inferences gave rise to the inference that Bogseth was able to do so because Kim was already dead.  See *Hardiman*, 466 Mich at 428.

There was also evidence that Bogseth took steps to conceal his involvement in Kim's disappearance and to cause the investigation to focus on Brink.  Testimony established that the 61 text messages that had been sent between Kim's phone and Bogseth's phone on the morning of her disappearance had been deleted on both Bogseth's phone and Kim's phone.  The fact that the same texts—and apparently only those texts—had been deleted from both phones, when considered with the evidence that Kim's phone was found concealed in Bogseth's SUV, gave rise to an inference that Bogseth deleted the text messages from both phones and that he did so to preclude anyone from discovering the content of the messages.

Jon Evans further testified that, on the evening after police officers searched Bogseth's home and found Kim's phone in Bogseth's SUV, someone matching Bogseth's description and wearing a similar shirt to the one he was wearing ran across the yard from the area of the trails toward Brink's home.  Bogseth had been acting peculiarly after the police officers searched his home and then left for a time.  He returned shortly after the person had been seen running through the yard behind his home.  Sometime after he returned, Bogseth abruptly stated that he had found Kim's purse in Brink's yard.  This testimony permitted an inference that Bogseth left on the evening after the police searched his home, retrieved Kim's

purse, and placed it on Brink's lawn in an apparent attempt to focus the investigation on Brink. *Id*.

Considering all the circumstantial evidence together, including the evidence that Bogseth took steps to convince others that Kim had merely run off and that he likely planted Kim's purse on Brink's lawn, the jury could find beyond a reasonable doubt that Bogseth killed Kim and that he killed her with the hammer that he normally kept in his tool bag in his SUV at some point after he picked Kim up at around 10:40 a.m. but before he was seen at 12:30 p.m. on that same day. That is, there was evidence from which a rational jury could conclude beyond a reasonable doubt that Bogseth killed Kim within a short time after they drove away from their home. The remaining question is whether there was sufficient evidence from which a reasonable jury could infer that Bogseth acted willfully, deliberately, and with premeditation when he killed her. *Dykhouse*, 418 Mich at 495.

The evidence showed that Bogseth picked Kim up in his SUV and drove away with her. Bogseth told officers shortly after Kim's disappearance that he argued with Kim during the ride to her work and that she repeatedly insisted that he let her out. There was testimony that Kim's injuries were consistent with having been caused by a claw hammer like the one Bogseth kept in his tool bag in the back of his SUV. There was also testimony that her injuries would have resulted in significant blood loss. Yet officers did not find evidence consistent with such blood loss in Bogseth's SUV.

When viewed in the light most favorable to the prosecution, the testimony and evidence established that Kim had gotten out of the SUV at some point after Bogseth picked her up from home but before he attacked her with the hammer. Because the evidence showed that Bogseth kept a hammer in his tool bag in the back of the SUV, a jury could reasonably infer that Bogseth used the hammer that he had on hand to strike Kim. And it could reasonably find that he had to retrieve his hammer before he could do so. That is, a rational jury could find from the evidence that Bogseth had to both get out of the SUV and retrieve his hammer before he could strike Kim. He also had to move to the location where he struck Kim outside the SUV. Testimony established that Kim was hit in the back of the head and on the face with the hammer, and the examination of her remains did not reveal defensive wounds. From this, the jury could infer that Bogseth hit Kim from behind.

The evidence that Bogseth repeatedly struck Kim in the head with the hammer permits an inference that he intended to kill her—that is to say, that he willfully killed her. *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014). The evidence that he retrieved his hammer and moved to Kim's location outside the SUV before striking her is evidence that he acted with deliberation and not in the heat of the moment. Further, during the time that it would have taken to retrieve the hammer and approach Kim before striking her, Bogseth would have had ample opportunity to consider his actions and take a second look before

> proceeding. See, e.g., *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999) (recognizing that movement can be indicative of premeditation); *Tilley*, 405 Mich at 45 (recognizing that securing possession of a weapon and following the victim is evidence of premeditation and deliberation). Thus, there was ample time for Bogseth to deliberate and premeditate whether to kill Kim. *Morrin*, 31 Mich App at 330. Moreover, although the brutality of the attack on Kim was not evidence of premeditation and deliberation, *People v Hoffmeister*, 394 Mich 155, 159; 229 NW2d 305 (1975), the nature of the injuries to Kim's skull—both back and front—suggest that Bogseth would have had an opportunity to reflect on what he was doing before he ended her life, see *Johnson,* 466 Mich at 733.
>
> When viewed in the light most favorable to the prosecution, the evidence permitted an inference that Bogseth stopped the SUV, retrieved his hammer from the back, moved to the location where Kim was after she left the SUV, and bludgeoned her to death. The choices implicit in these acts reflect deliberation and premeditation. The prosecution presented sufficient evidence to allow a rational jury to find beyond a reasonable doubt that Bogseth murdered Kim and that he did so willfully, deliberately, and with premeditation. *Dykhouse*, 418 Mich at 495; *Morrin*, 31 Mich App at 330.

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1719–1723.)

Petitioner attacks the court of appeals' sufficiency analysis first by complaining that the evidence was circumstantial. (Pet., ECF No. 1-1, PageID.18–19.) In Petitioner's reply brief he expands upon that complaint by stating the jury was invited to speculate with regard to the time, location, murder weapon, and the series of events that preceded the death of Petitioner's wife. (Pet'r's Reply Br., ECF No. 16, PageID.2440.) The only way to fill the gaps in the direct evidence, Petitioner claims, is to use "inferences upon inferences." (*Id*., PageID.2444.) Petitioner contends that there is "no other evidence or testimony concerning state of mind or the actual events, only the body and subsequent inferences of guilt." (*Id*., PageID.2445.) Petitioner states that the prosecution stacked multiple inferences, essentially manufacturing a sequence of events to support a verdict. (*Id*., PageID.2445–2447.)

Petitioner's contention that the court of appeals stacked inference upon inference is inescapable. His further claim that the multiple inferences amount to speculation is not.

Petitioner invokes the authority of *Newman v. Metrish*, 543 F.3d 793 (6th Cir. 2008), where the Sixth Circuit acknowledged that the *Jackson* standard, though "easy to articulate . . . is difficult to apply." *Id*. at 796. The *Newman* court noted that, "where there is only circumstantial evidence available . . . [the] ineffable [*Jackson*] standard is especially challenging, and even more so when that evidence supports a host of permissible inferences." *Id*. The court concluded that Newman's sufficiency challenge had merit because the evidence did not support reasonable inference, only speculation. *Id*. at 796–97; *see also Parker v. Renico*, 506 F.3d 444, 452 (6th Cir. 2007) ("[W]e continue to 'distinguish reasonable speculation from sufficient evidence . . . in establishing that the state court's application of federal constitutional law as set forth in *Jackson* . . . was objectively reasonable.'"); *United States v. Jackson*, 404 F. App'x 982, 987 (6th Cir. 2010) ("While circumstantial evidence giving rise to reasonable inferences can support a conviction, 'reasonable speculation' is not sufficient evidence.").

The Supreme Court has also separated sufficient from insufficient evidence by assessing whether the finding could be based on reasoned inference or only speculation. *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). And, importantly, the *Coleman* Court provided some guidance with respect to the distinction. Based on the Court's analysis, a reasonable inference is an inference that a rational factfinder could make from the facts. That is not a particularly onerous burden. The Court went so far as to say, "the only question under *Jackson* is whether [a] finding [is] so insupportable as to fall below the threshold of bare rationality." *Id*. at 656.

Certainly, the "stacked" inferences identified by the trial court ***could*** rationally flow from the underlying facts. The inferences are not compelled by the facts. But they do not need to be. The *Coleman* Court specifically rejected the requirement that the inferences must be "more likely than not." *Id*. at 654-56.

To succeed in his challenge, Petitioner cannot simply reject the identified inferences, complain that there are other equally compelling—or even more compelling—inferences, or declare the identified inferences to be speculation.  He must show that the identified inferences are irrational.  That is a heavy burden; that is undoubtedly why the Sixth Circuit describes the *Jackson* standard as "'a nearly insurmountable hurdle.'"  *Davis*, 658 F.3d at 534 (quoting *Oros*, 578 F.3d at 710).

Petitioner has not met that burden here.  He has not shown that the court of appeals' detailed analysis of the evidence and the inferences drawn from that evidence are irrational.

Petitioner also attacks the sufficiency of the evidence by scouring the record for evidence that favors him, evidence that runs counter to the prosecution's theory of the case.  For example, Petitioner relies heavily on testimony offered by an expert regarding a likely time of death based on the typical interval between death and the presence of certain insects as the body decomposes. The expert estimated a date and time of death that was days later than the date and time based on the prosecutor's theory.

Petitioner's effort to collect the evidence that favors him turns the *Jackson* standard on its head.  *Jackson* does not require the habeas court to sift through the evidence and place it on one side of the scale or the other for the purpose of assessing whether the jurors' estimation of the balance is correct.  This Court is only required to look at the evidence in a light that favors the prosecution and assess whether a rational factfinder could conclude that Petitioner is guilty beyond a reasonable doubt considering that evidence.  It is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are rational.  Petitioner's invitation to focus on the evidence and inferences that favor him is inappropriate.

Accordingly, Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the verdict is contrary to, or an unreasonable application of, clearly established federal law, and he is not entitled to habeas relief.

## IV. Admissibility of the hammer

The prosecutor introduced several exhibits during the trial.[2] Petitioner does not contend the admission of those exhibits violated his constitutional rights. Instead, he complains that the prosecutor's display and use of a hammer as a demonstrative aid warrants habeas relief. The hammer, however, was never admitted into evidence.

The injuries to the victim were consistent with the use of a claw hammer as the murder weapon. (Trial Tr. V, ECF No. 14-11, PageID.1507.) The police identified several hammers to which Petitioner may have had access during the relevant time period, but none of them bore indicia of being the murder weapon. (*Id*., PageID.1665.) Petitioner's employer testified that Petitioner owned and used a particular hammer, described as a steel shaft hammer with a leather ring-stacked handle with some inlay. (Trial Tr. IV, ECF No. 14-10, PageID.1330–1331.) The described hammer was never located.

Because the hammer was never located, the prosecutor could not produce the hammer or admit it as an exhibit at trial. Petitioner's employer's description of the hammer, however, was specific. To facilitate questioning of the employer, and the officer who searched Petitioner's vehicle, the prosecutor purchased a hammer matching the description and, when questioning the

[2] The exhibits included photographs, Petitioner's cell phone, the victim's cell phone, cell phone records and reports, a CD case, a red bag, a garbage bag that covered the body, garbage bags from Petitioner's residence, the victim's purse, Petitioner's notebook, Petitioner's work time sheets, a tire inflater can from Petitioner's vehicle, forensic reports, autopsy reports, and DNA reports. (Trial Tr. I, ECF No. 14-7, PageID.520; Trial Tr. II, ECF No. 14-8, PageID.778; Trial Tr. III, ECF No. 14-9, PageID.1035; Trial Tr. IV, ECF No. 14-10, PageID.1233; Trial Tr. V, ECF No. 14-11, PageID.1485.)

officer, asked "did you ever find a hammer that looked like this one?" (*Id.*, PageID.1279.) And when Petitioner's employer described the hammer that he knew Petitioner possessed and used, the prosecutor, after explaining that the hammer he displayed was not Petitioner's but was only a demonstrative exhibit, asked "does that hammer appear to be the one that was carried by Mr. Bogseth?" (*Id.*, PageID.1331.) The employer indicated that it was "[v]ery similar." (*Id.*)

The first time the prosecutor displayed the hammer, Petitioner's counsel objected. In the presence of the jury, counsel objected that the hammer was outside the scope of the cross-examination that preceded the prosecutor's questions. (*Id.*, PageID.1279.) The court overruled that objection. (*Id.*, PageID.1280.) The witness finished testifying shortly thereafter. The court gave the jurors a break, and during the break, counsel expanded his objection. Counsel explained that there was no foundation laid that the hammer displayed was anything like a hammer Petitioner possessed or used, that it was irrelevant, and that the prosecutor's display of it was prejudicial. (*Id.*, PageID.1282–1286.) Counsel requested a curative instruction.

The court gave the following instruction:

> At the very end of the witness'[s] testimony, the prosecution showed the witness a hammer. I want to make it very clear to that that hammer that was shown to the witness is not evidence in this case. It is not going to be introduced as evidence in this case. It is not going to be introduced as an exhibit in this case. The parties both agree to this issue. So it will not be an admitted exhibit. It is simply a demonstrative aid for the prosecution when he was asking that question. So you may not consider demonstrative evidence as admitted evidence in a case.
>
> I will give you final instructions that clarify all of this for you in more detail, but when you're deliberating and when you're reaching a conclusion, you may only consider the evidence that has been admitted in the case, the sworn testimony of the witnesses and anything else I tell you to consider as evidence as well as the law I provide you, obviously.
>
> I'm telling you not to consider the demonstrative aid of that hammer that was just shown as evidence.
>
> Do you all understand that? Thank you. All have indicated in the affirmative.

(*Id.*, PageID.1289.) Both counsel agreed that the instruction was satisfactory. (*Id.*, PageID.1290.)

Petitioner's characterization of this challenge as one relating to the admission of evidence, therefore, is not accurate. The hammer was never actually admitted into evidence. Nonetheless, the prosecutor displayed the hammer in the presence of the jury, during the testimony of two different witnesses. The Court construes Petitioner's objection as contesting the display of the hammer, not its admission. That objection, however, is separate and distinct from Petitioner's further claim that the prosecutor improperly displayed the hammer again during closing arguments and then referred to it as if it were the murder weapon. That prosecutorial misconduct claim is discussed below.

With regard to Petitioner's objection to the display of the hammer during testimony, the Michigan Court of Appeals considered the question on two levels: (1) was the display of the hammer appropriate as a demonstrative aid; and (2) would the hammer have been admissible as demonstrative evidence. Michigan law regarding the admissibility of demonstrative evidence—indeed, specifically, a weapon similar to one allegedly used in the commission of a crime—is set forth in *People v. Castillo*, 584 N.W.2d 606 (Mich. Ct. App. 1998), as follows:

> We review a trial court's determination to admit evidence for an abuse of discretion. *People v. Hoffman*, 225 Mich App 103, 104, 570 NW2d 146 (1997). Demonstrative evidence, including physical objects alleged to be similar to those involved in the incident at issue, is admissible where it may aid the fact finder in reaching a conclusion on a matter material to the case. See *People v. Howard*, 391 Mich 597, 602–603, 218 NW2d 20 (1974); *People v. Gunter*, 76 Mich App 483, 493–494, 257 NW2d 133 (1977). As with all evidence, to be admissible, the demonstrative evidence offered must satisfy traditional requirements for relevance and probative value in light of policy considerations for advancing the administration of justice. See MRE 401–403; 23 CJS, Criminal Law, § 846, p. 37. Beyond general principles of admissibility, the case law of this state has established no specific criteria for reviewing the propriety of a trial court's decision to admit demonstrative evidence. However, we find persuasive, and adopt for this state's jurisprudence, a test espoused by the Supreme Court of

> Missouri: A weapon similar to one allegedly used in the commission of a crime may be admitted as demonstrative evidence where substantial evidence attests to the similarity of the exhibit offered to the weapon allegedly used, there is no reasonable likelihood that the jury may fail to understand the demonstrative nature of the evidence, and the opposing party has ample opportunity for cross-examination regarding the demonstrative weapon. *State v. Carter*, 955 SW2d 548, 561 (Mo., 1997).

*Castillo*, 584 N.W.2d at 608 (footnote omitted).

In Petitioner's case, however, because the evidence was not actually admitted, it was not demonstrative evidence. It was more in the nature of a demonstrative aid. *Campbell v. Menze Const. Co.,* 166 N.W.2d 624, 626 (Mich. Ct. App. 1968) ("The use of blackboards, charts and other visual aids at a trial is common practice. Counsel for both sides should be encouraged to present their case in a way that will be most clearly understood by the jury."). Certainly, display of a steel shaft hammer with a leather ring-stacked handle with inlay facilitated the jury's understanding of what Petitioner's employer meant when he noted that Petitioner possessed and used a steel shaft leather ring-stacked claw hammer that he kept in a black and blue bag in the back of his vehicle. Display of the hammer facilitated the jury's understanding again when the officer testified that no such hammer was found in the bag in the back of Petitioner's vehicle, even though another hammer was found. The court of appeals thought that the hammer was more like a demonstrative exhibit that could have been admitted than a visual aid. Nonetheless, under state law, specifically *Castillo* and *Campbell*, the court of appeals also concluded that the presentation of the hammer during testimony would have been appropriate either way.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. at 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction . . . [for] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id*. at 67–68.

Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)); *see also Wilson v. Sheldon*, 874 F.3d 470, 475–76 (6th Cir. 2017). This approach affords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, a court may not grant relief if it merely would have decided the evidentiary question differently.[3] The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard. He does not cite any clearly established federal law that conflicts with the court of appeals' determination regarding demonstrative evidence or aids, nor does he cite any Supreme Court decision with materially indistinguishable facts from those in Petitioner's case, that decided the evidentiary issue differently. Accordingly, Petitioner is not entitled to habeas relief on this issue.

[3] In fact, the Court is bound by the state court's determination that presentation of the hammer was permitted under state law. As the Supreme Court explained in *Estelle*, "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67–68. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

**V. Prosecutorial misconduct**

This Court may grant habeas relief on the basis of prosecutorial misconduct where the petitioner demonstrates that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "The touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 210 (1982). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12–13; *Darden*, 477 U.S. at 181–82; *Donnelly*, 416 U.S. at 646–47; *Berger v. United States*, 295 U.S. 78, 84–85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly* 416 U.S. at 645). Thus, to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington*, 562 U.S. at 103).

**A. "this hammer"**

The focus of Petitioner's prosecutorial misconduct claims is the prosecutor's reference, during closing argument, to the hammer used as a demonstrative aid. Petitioner claims that the prosecutor invited the jurors to conclude that the hammer the prosecutor displayed was the hammer Petitioner used to murder his wife. The court of appeals did not directly address the argument when it resolved Petitioner's many other complaints regarding the prosecutor's misconduct. (Mich. Ct. App. Op., ECF No. 14-14, PageID.1728–1730.) The appellate court might have considered the matter resolved by way of its analysis regarding the prosecutor's use of the demonstrative aid generally. (*Id.*, 1723–1725.) Because the court of appeals may not have resolved this prosecutorial misconduct issue, the Court will address it *de novo*. To the extent the court of appeals addressed the claim by way of its general demonstrative aid analysis, AEDPA deference to that resolution would yield the same result.

"[T]he government may not rely on prejudicial facts not in evidence when making its closing arguments." *United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007). Nonetheless, "[a] prosecutor has 'leeway to argue reasonable inferences from the evidence' during closing arguments." *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (quoting *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000), superseded in other respects by the AEDPA as stated in *Stewart v. Winn*, 967 F.3d 534, 540 (6th Cir. 2020)).

In recounting the evidence provided by one of the forensic experts, the prosecutor stated:

> But look, look at the damage that was done to the face of Kimberly Bogseth. Look at the pure amount of rage and anger that would have been involved to do something like that to somebody, **to plunge a claw hammer like this one into somebody's skull** on 10 different occasions, over and over and over again to the point where the hammer actually gets caught and you rip the hammer out, ripping

> out pieces of the skull and flesh. Right here. Claw hammer. Look at the bottom exhibit. Look at the two marks. Look at the claw end of this hammer. *This is the claw that was used to create those marks of one of the many blows delivered during the fury of the defendant's attack.*

(Trial Tr. V, ECF No. 14-11, PageID.1614) (emphasis added).[4] Petitioner focuses entirely on the italicized words to argue that the prosecutor invited the jurors to conclude that the hammer the prosecutor was apparently holding was, in fact, the hammer Petitioner used to commit the crime.

The interpretation urged by Petitioner is certainly one way to read the italicized sentence. But that interpretation is only viable when viewing that sentence in isolation. Picking phrases or sentences out of an argument is not the proper approach. "[A] prosecutor's comments violate the defendant's right to due process only if, ***in context***, they 'undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice.'" *Winowiecki v. Gidley*, No. 20-1461, 2020 WL 6743472, at *2 (6th Cir. Sept. 8, 2020) (quoting *Young*, 470 U.S. at 16) (emphasis added); *see also United States v. McQuarrie*, 817 F. App'x 63, 81 (6th Cir. 2020) ("[C]ontext is key . . . .").

---

[4] Petitioner suggests that the prosecutor displayed the hammer used as a demonstrative aid while he made this argument. That makes sense, but it is impossible to confirm from the transcript alone. For purposes of this analysis, the Court presumes Petitioner's description of the event is accurate.

Petitioner identified another alleged instance of improper argument regarding the hammer. In rebuttal, the prosecutor argued:

> What does he do? He smashes her in the back of the head with this, with a hammer. Remember, no defensive wounds. We've talked about that. No defensive wounds. Strikes her over and over and over again with a claw hammer, brutal way to die, crushing her skull, damaging her brain, destroying her face. Common sense tells you you could draw the inference from that that anger is involved, that rage is there. The defendant is mad. He's upset.

(Trial Tr. V, PageID.1683–1684.) In that excerpt, the prosecutor changed his reference from "this"—presumably the demonstrative hammer he was holding—to "a hammer," and then continued referring to "a claw hammer." (*Id.*, PageID.1684.) The reference during the prosecutor's rebuttal argument, therefore, does not permit the same potentially objectionable interpretation.

One need only look at the paragraph containing the purportedly offensive sentence to see that the prosecutor was not inviting the jurors to conclude that the hammer the prosecutor was holding was the murder weapon; rather, the hammer the prosecutor was holding was like the one the prosecutor argued was used to kill Petitioner's wife.  As set forth above, although that argument stacked inference upon inference, the inferences were at least rational.  The forensic expert testified that the injuries to the victim were consistent with the use of a claw hammer as the murder weapon.  Petitioner's boss testified that Petitioner possessed and used a particular distinctive claw hammer and that Petitioner kept that hammer in the bag that was found in Petitioner's vehicle.  The officer who searched Petitioner's vehicle found the bag, but it contained a different hammer, one that Petitioner may have borrowed from his employer's tool shed.  The police did not find the distinctive hammer.

Moreover, stepping back even further, the trial judge and the prosecutor had emphasized during the testimony of the witnesses that the hammer that the prosecutor displayed was definitely not the hammer that Petitioner purportedly possessed and used.  Rather, the displayed hammer was one the prosecutor had purchased for the purpose of a visual reference for the testimony of Petitioner's employer and the officer who conducted the search of Petitioner's vehicle.  The trial judge had specifically instructed the jurors that they could not consider the displayed hammer as evidence and that they could not consider the arguments of counsel as evidence either.  Petitioner's counsel also reminded the jurors that the hammer that the prosecutor held up was not evidence.  (Trial Tr. V, ECF No. 14-11, PageID.1627.)

Considering the prosecutor's arguments in context, the Court concludes that the prosecutor's argument displaying the hammer was not misconduct.  Moreover, even if the specific sentence Petitioner finds objectionable could be characterized as an unfair comment on

the evidence, in context and in light of the disclaimers and cautions that accompanied display of the hammer, it did not prejudice Petitioner. Accordingly, Petitioner has failed to establish that he is entitled to habeas relief based on that aspect of the prosecutor's closing argument.

**B. Other claims of misconduct**

Petitioner raised a bevy of other prosecutorial misconduct claims in the Michigan Court of Appeals. He presents a subset of those claims to this Court. These additional claims appear only in his initial petition.

**1. Discovery violations**

Petitioner claims that the prosecutor failed to disclose all of the pictures related to the prosecution, all of the 911 calls, criminal records for the state's witnesses, and the hammer used as a demonstrative aid. (Pet., ECF No. 1-1, PageID.30.) The court of appeals addressed the argument as follows:

> Bogseth argues that the prosecutor failed to disclose certain items during discovery. Specifically, he maintains that the prosecutor failed to turn over all the photos taking during the recovery of Kim's remains, failed to turn over the recordings of the 9-1-1 calls from the day Kim's remains were found, failed to disclose the criminal records for Brinks and Jon Evans, and failed to ensure that the police officers' field notes were preserved. However, on appeal, Bogseth has not provided any evidence that the prosecutor actually failed to disclose or provide evidence in discovery that Bogseth requested and over which the prosecutor had control. Instead, the record reflects that the prosecutor complied with every discovery request.[2]
>
> [2] Bogseth's lawyer did state that they were awaiting copies of the officers' field notes that were used to prepare the police reports and some additional photos that may have been referred to in various reports. However, the prosecutor informed the court that the field notes were destroyed as a matter of routine practice once the report has been prepared and reviewed to ensure that the report comported with the notes. The loss of evidence before a discovery request—such as the field notes used to prepare the reports—will not warrant relief absent proof of intentional suppression or bad faith. See *People v Jones*, 301 Mich App 566, 580; 837 NW2d 7 [2013]. Here, there is no evidence of an intentional suppression or bad faith.

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1728.)

To the extent Petitioner's claim is based solely on a violation of Michigan's discovery rules, it is not cognizable in this action.  "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'"  *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases).  Federal courts have no power to intervene on the basis of a perceived error in applying state law.  *Wilson*, 562 U.S. at 5.

Moreover, as the Supreme Court has explained, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* [*v. Maryland*, 373 U.S. 83, 87 (1963),] did not create one."  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *accord Gray v. Netherland*, 518 U.S. 152, 168 (1996).  "Rather, all the Constitution requires, per the due process clause, is that the defendant not be deprived of a fundamentally fair trial."  *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002).  Thus, a prosecutor's failure to disclose evidence before trial does not necessarily raise a cognizable issue on habeas review.  *See id.*

Moreover, the court of appeals determined that, on the record before the panel, the prosecutor provided all of the discovery that Petitioner was due.  That determination is presumed correct.  Petitioner can only overcome that presumption with clear and convincing evidence.  Petitioner offers no evidence at all.

It is true that suppression by the prosecution of evidence favorable to the defendant violates due process, where the evidence is material either to guilt or punishment of the defendant.  *See Brady*, 373 U.S. at 87.  It is also true that a criminal defendant has a constitutional right to a "meaningful opportunity to present a complete defense."  *California v.*

*Trombetta*, 467 U.S. 479, 485 (1984), *quoted in Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006). The right to present a complete defense derives from the Sixth Amendment right to compel and confront witnesses and from the Due Process Clause of the Fourteenth Amendment. *See Holmes*, 547 U.S. at 324; *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.").

But Petitioner did not raise his discovery claims in the state court as claims that the prosecutor committed a *Brady* violation or that the prosecutor deprived Petitioner of a meaningful opportunity to present a complete defense. Petitioner's claims as presented to this Court also fail to implicate his federal constitutional rights. Accordingly, Petitioner has failed to demonstrate that the court of appeals' rejection of his discovery violation claims is contrary to, or an unreasonable application of, clearly established federal law. Thus, Petitioner is not entitled to habeas relief on his discovery claims.

**2. Evidentiary violations**

Petitioner complains that the prosecutor introduced into evidence the following: (a) reports relating to cell phones—reports that were not certified business records; and (b) a notebook that was not authenticated. (Pet., ECF No. 1-1, PageID.30.) The trial judge admitted those items as evidence. "A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008). That is so "whether or not the ruling itself was correct." *Frazier v. Huffman*, 343 F.3d 780, 792 (6th Cir. 2003). "It certainly does not violate clearly established

federal law for a prosecutor to rely on evidentiary rulings made by the trial court." *Key v. Rapelje*, 634 F. App'x 141, 147 (6th Cir. 2015). Thus, Petitioner cannot prevail on this claim.

**3. Sandbagging the defense by presenting prosecution witnesses after defense witnesses had been called**

Petitioner contends that the prosecutor held off on proofs of the victim's identification and the cause of death until after the defense had presented its witnesses—out of order—to accommodate the prosecutor's difficulty in presenting witnesses in order. (Pet., ECF No. 1-1, PageID.31) ("This present case has a prejudicial foundational flaw at trial as well. Instead of showing that a crime took place, that it was in fact a murder by showing the cause, then showing the positive identification of then the circumstances of the case at hand. The prosecution doesn't show cause or positive identification until after the defense had called their witnesses due to the prosecution's 'scheduling.' The petitioner's trial was defective and unfair by the prosecutorial misconduct."). If Petitioner raised this claim in the court of appeals, the court did not address it.

As the end of the prosecutor's proofs approached, it became apparent that he would finish with his witnesses, except for the experts, in the middle of a day. The expert witnesses, however, were not scheduled to appear until the next day. The court had a choice to end the trial day early or take some witnesses "out of order."[5] Petitioner did not object to presenting the testimony of defense witnesses before the testimony of the prosecution's experts. Petitioner called Deputy Cody Anderson regarding his review of surveillance videos at Walmart; Zane Niles, regarding his contact with a person in the Walmart parking lot on September 2, 2015, a person that Mr. Niles believed might have been the victim based on a picture of the victim that was shown on the news; and Laura Lee Adams, the Bogseths' landlord and friend. None of these witnesses had

[5] The issue was anticipated before trial started. The trial judge advised the parties that she might proceed with witnesses out of order in the event there was time left. (Final Pretrial Conf. Tr., ECF No. 14-6, PageID.511–512.)

anything to say regarding the identification of the victim or the events that occurred at the time of her death.

Moreover, Petitioner had every opportunity to call other witnesses who might have testified regarding the identity of the victim or the circumstances regarding her death after the prosecution's expert witnesses testified. Instead, the Petitioner moved for a directed verdict and, after the motion was denied, rested. To suggest that the change in the order of the witnesses had any detrimental impact on the presentation of Petitioner's case, particularly the specific impact Petitioner alleges, lacks any basis.

Additionally, it does not appear that the prosecutor had any particular role to play in altering the typical order of the proofs here. It was the trial judge's decision to take witnesses out of order rather than lose a half day of trial. And it was within the trial judge's discretion to change the order of proofs.

Petitioner has offered no support for his implicit claim that there is a constitutional right to present proofs in a particular order. Michigan Rule of Evidence 611(a) requires the trial judge to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence.[6] The Supreme Court has acknowledged the propriety of a trial judge's discretionary control over the order of testimony. *Geders v. United States*, 425 U.S. 80, 86 (1976) ("'[T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.' [citation omitted]. A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none. The trial judge must meet situations as they arise and to do this must have broad power to cope with

---

[6] The rule when adopted was identical to the parallel Federal Rule of Evidence. Mich. R. Evid. 611, Staff Comment to 1978 Adoption ("MRE 611(a) and (c) are identical with Rule 611(a) and (c) of the Federal Rules of Evidence.").

the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion. [citations omitted].").

The Sixth Circuit, considering the parallel federal rule, has concluded that the trial court's discretion with regard to the mode and order of proof at trial is not limited unless the exercise of that discretion affects "substantial rights." *United States v. Bailey*, 973 F.3d 548, 563 (6th Cir. 2020). Petitioner does not explain how the switch in order here impacted his substantial rights. It did not interfere with his ability to confront witnesses, his ability to present a defense, the burden of proof, or the presumption of innocence. There is nothing in the record or the law to support a claim for prosecutorial misconduct with regard to the order of proofs in Petitioner's trial. Therefore, his claim is meritless.

**VI. Ineffective assistance of counsel**

Finally, Petitioner argues that he was denied the effective assistance of counsel in violation of the Sixth Amendment. Petitioner presented several ineffective assistance of trial counsel claims in the state court. In this Court, his ineffective assistance claims include the following:

- counsel did not list the private investigator as a witness, nor did counsel call the investigator to testify;

- counsel failed to file a notice of alibi or adequately introduce Petitioner's work and telephone records to demonstrate that Petitioner was many miles away at the alleged time his wife was murdered;

- counsel failed to adequately challenge the credibility of witness Verity with regard to her drug use or her boyfriend's doubts regarding the veracity of her testimony;

- counsel failed to impeach or suppress the testimony of witnesses Evans or Brink based on their criminal records or mental disorders;

• counsel failed to call witnesses, in addition to Zane Niles, who reported that they had seen the victim after September 1, 2015;

• counsel did not call the Bogseths' landlord's husband who reportedly had yelled at the Bogseths' landlord that she had killed the victim;

• counsel failed to provide in discovery social media posts from the landlord that might have benefited Petitioner's defense;

• counsel failed to obtain through discovery the documents referenced in § V.B.1., above; and

• counsel failed to move to suppress evidence when he "had to know there were issues with evidence taken without proper warrants [and] signs of evidence tampering . . . , affidavit issues for search warrants, and [issues for] the affidavit for the petitioner's arrest warrant."

(Pet., ECF No. 1-1, PageID.25–29.)[7] In Petitioner's reply brief, he adds an additional claim that counsel was ineffective for failing to object to the prosecutor's use of the hammer during closing argument. (Pet'r's Reply Br., ECF No. 16, PageID.2451) ("The failure to object to closing arguments, request a specific curative instruction, and seek a mistrial based on the repeated violations was ineffective assistance that would likely have changed the trial's result.").

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate a claim of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see*

[7] Petitioner echoed these claims in a supplement. (Pet'r's Supp., ECF No. 3, PageID.127–129.)

*also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, when a federal court reviews a state court's application of *Strickland* under Section 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals applied the following standard to resolve Petitioner's ineffective assistance of counsel claims:

> "To establish a claim of ineffective assistance of counsel, the defendant must show that 'counsel's representation fell below an objective standard of reasonableness' under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Gioglio*, 296 Mich App at 22, quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 St Ct 2052; 80 L Ed 2d 674 (1984).

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1726.) It is beyond dispute that the state appellate court applied the correct standard. To prevail, Petitioner must show that the state court applied the standard unreasonably.

**A. Failure to prevent the prosecutor's use of the hammer**

The Michigan Court of Appeals determined that the prosecutor's use of the hammer was not improper. Because the prosecutor's use of the hammer was not improper, the court concluded that Petitioner could not "demonstrate that that defense counsel's failure to prevent the prosecutor's use amounted to ineffective assistance of counsel." (*Id.*, PageID.1725.) The state court's determination of this issue was neither contrary to, nor an unreasonable application of, *Strickland* because "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

**B. Failure to file a notice of alibi**

Petitioner's statement of this claim in his petition is sparse. He provides a little more detail in his *pro per* supplemental brief filed in the Michigan Court of Appeals:

> The Defendant wanted and requested to file alibi notices for the days in question. An alibi notice for a homicide case is completely reasonable. In this present case there was evidence to support the alibis. The evidence was easily obtainable. Defendant's counsel should have obtained this evidence and filed an alibi notice for at least the day in question from the prosecutor's theory . . . and what was then admitted at trial through Dr. Ryan Kimbirasukas the forensic entomologist as per the estimated time of death being different from the prosecutor's theory, the Defendant's request to counsel to file an alibi supported by evidence went unfulfilled.

(Pet'r's *Pro Per* Supp. Br., ECF No. 14-14, PageID.1867–1868.) Thus, it appears that Petitioner wanted his counsel to file a notice of alibi for the brief period of time during September 1, when the prosecutor theorized Petitioner had murdered his wife, and also for the days that followed, which corresponded to the forensic entomologist's estimation of the time of death based on insect activity.

The court of appeals rejected Petitioner's claim:

> Bogseth first argues that his lawyer's failure to file a notice of alibi was unreasonable and prejudiced his trial. He does not, however, identify the alibi evidence that would have established that he could not have committed the

> murder. Thus, he failed to establish the factual predicate for this claim. *People v. Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1726.) Petitioner has not corrected this defect in his submissions to this Court.

Even though counsel did not file a notice of alibi for September 1—the date the prosecutor theorized Petitioner murdered his wife—there was testimony regarding Petitioner's whereabouts during the relevant time frame. Petitioner self-reported his work hours and work locations to his employer. The report for that date indicated that Petitioner was at a particular location at the relevant time. But Petitioner's employer testified that the business had no work at that location on that date. Petitioner has not identified any witness who might have corroborated Petitioner's work report.

Petitioner likewise provides no detail regarding his "alibi" for subsequent days. Presumably Petitioner's work reports would account for some of his time; but it would be difficult to establish an effective alibi for every minute of an indefinite time period that spanned days. Moreover, even if Petitioner could conclusively account for the entire time period, it would only establish a defense to a crime of which he was not accused. The prosecutor's entire theory of the case depended upon Petitioner killing his wife near the time he was supposed to be dropping her off at work on September 1.

Absent some elaboration from Petitioner as to the nature of the alibi that counsel chose to forgo, it is impossible to say that counsel's choice was professionally unreasonable or that the choice prejudiced Petitioner. The court of appeals' determination to that effect was neither contrary to, nor an unreasonable application of, *Strickland*.

### C. Failure to call witnesses who may have seen the victim after September 1

Petitioner next argues that counsel rendered ineffective assistance because he failed to call as witnesses persons who reported that after September 1 they saw a female that matched the victim's description. Petitioner did not clearly identify the witnesses or the nature of their testimony when he raised the argument in his supplemental *pro per* brief on direct appeal. For that reason, the court of appeals rejected Petitioner's claim:

> But, as with his alibi claim, Bogseth has not offered any meaningful analysis of the law or facts, nor has he presented any evidence that these witnesses would have testified favorably to his defense. By failing to establish the factual predicate for this claim of error, Bogseth failed to establish that his lawyer's decision to refrain from calling these witnesses fell below an objective standard of reasonableness.

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1727.)

Petitioner provided more of a factual predicate in connection with his motion for relief from judgment. He attached police reports (ECF No. 14-15, PageID.1994–2001) that memorialized communications between police and persons who, in response to broadcast of the victim's picture as a missing person (ECF No. 14-15, PageID.1993), called in to say that they may have seen her. The additional facts, however, did not enhance his claim.

Petitioner attached a report that shows a contact from Merle Stone. On September 6, 2015, Mr. Stone saw the missing person report on Facebook. When he saw the picture, he recalled that three days earlier, he stopped at a rest stop on eastbound Interstate 94. While there, he saw an unkempt female, small in stature, wearing jeans and a tank top, that, looking back, he believed may have been the missing person.

Petitioner attached a report that shows a contact from Timothy Rausch. On September 7, 2015, Mr. Rausch reported that he had seen a female at an Admiral gas station in Grand Rapids, Michigan, and he was "pretty sure" that it was the person reported missing.

Finally, Petitioner attached a report that shows a contact from Zane Niles.  Mr. Niles reported that he saw and spoke with a person who looked like the "missing person" on September 2, 2015, in the parking lot at the South Haven Walmart.  Officers obtained surveillance video from Walmart that confirmed Mr. Niles's contact with a woman in the Walmart parking lot.  Counsel called Mr. Niles as a witness.

Petitioner does not indicate how calling Mr. Stone or Mr. Rausch would have improved his position.  Based on the Court's review of the reports, the report from Mr. Niles was the most likely to be a credible sighting of the victim given the location and timing of his encounter with the woman.  Moreover, the contact was confirmed by video.  The reports of Mr. Stone and Mr. Rausch seemed less likely given the lack of detail regarding their respective descriptions of the woman, and less likely given the locations of the encounters (eastbound Interstate 94 rest area or Grand Rapids, Michigan, when the victim had purportedly fled South Haven and headed west).

Importantly, the reports do not appear to be consistent with each other.  Simply increasing the number of sightings does not enhance their credibility where they appear to be inconsistent.  Indeed, it may detract from the credibility of all of them.

It appears that counsel reviewed the reports, picked the most credible report that was inconsistent with—and therefore cast doubt upon—the prosecutor's timeline, and presented it to the jury.  That would certainly be a reasonable strategy.  The reasonableness of that approach precludes Petitioner's ineffective assistance of counsel claim.  The Court begins with the presumption of regularity.  *Strickland*, 466 U.S. at 687 (citing *Michel*, 350 U.S. at 101); *see also Harrington*, 562 U.S. at 105 ("The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").  To overcome the presumption of

regularity, the defendant must show that the challenged action ***cannot*** be considered sound trial strategy. He has failed to do that.

**D. Failure to call the private investigator as a witness**

Counsel asked the trial court to appoint an investigator to assist in trial preparation because the investigatory reports were voluminous, and the prosecutor had identified a significant number of witnesses. (Mot. Hr'g Tr., ECF No. 14-5, PageID.484–487.) Petitioner claimed that counsel rendered ineffective assistance because he failed to call the investigator as a witness. The court of appeals rejected that claim:

> Bogseth also argues that his lawyer . . . should have called Bogseth's private investigator to testify about his findings. But, as with his alibi claim, Bogseth has not offered any meaningful analysis of the law or facts, nor has he presented any evidence that [this witness] would have testified favorably to his defense. By failing to establish the factual predicate for this claim of error, Bogseth failed to establish that his lawyer's decision to refrain from calling [this witness] fell below an objective standard of reasonableness.

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1726–1727.) Petitioner has never corrected the deficiency. The record does not disclose what testimony the investigator was supposed to provide to advance Petitioner's defense. Without that information it is impossible to say whether counsel's failure to call the investigator was professionally unreasonable or whether the failure had any impact on the likely outcome. Accordingly, Petitioner has failed to demonstrate that the court of appeals' rejection of this claim is contrary to, or an unreasonable application of, *Strickland*.

**E. Failure to properly develop and present evidence relating to the landlord**

Petitioner's landlord, Laura Lee Adams, testified. She considered herself a good friend to the Bogseths, in the nature of a grandparent to the Bogseths' son. When the victim disappeared, the best information Adams had about where the victim had gone came from a September 2,

2015, Facebook message—purportedly from the victim—to the effect that she had run away to California with some trucker.

As set forth in the appellate court's analysis of the evidence, one might reasonably infer from Petitioner's possession of the victim's phone and the mysterious deletion of texts between Petitioner and the victim, that the Facebook message was crafted by Petitioner. That was not apparent to Adams at the time. Moreover, Adams was already displeased with the victim because the victim had had an affair with Brink. The message that the victim had "run away"—from her family, her friends, and her work—infuriated Adams. In the following days, Adams took actions and made statements that reflected that anger. When the victim's body was found, however, Adams considered the message more carefully and realized that it did not sound like the victim at all. "[S]he had been duped." (Mich. Ct. App. Op., ECF No. 14-14, PageID.1727.) The evidence relating to Adams that Petitioner claims his counsel failed to develop and present is evidence relating to the period of time between the victim's disappearance and the discovery of her body.[8]

The record included facts that permitted the court of appeals to evaluate Petitioner's claim regarding Adams:

> Bogseth also faults his lawyer for not taking steps to secure the admission of posts that Adams made to Facebook, which he claims would establish reasonable doubt about whether Bogseth murdered Kim. He also argues that his lawyer should have done more to obtain the admission of the photo of Adams's vehicles. He states that one of the vehicles shown in the photo appears on the security footage from Walmart. The record reflects that Bogseth's lawyer attempted to admit the evidence of Adams's posts to Facebook around the time of Kim's disappearance

[8] One other item of evidence that relates to the landlord might fall outside of that category. Petitioner claimed that "Adams's husband . . . allegedly said to Adams, "You killed Kimmy, you killed your best friend[.]" (Mich. Ct. App. Op., ECF No. 14-14, PageID.1727.) Counsel did not call the husband. With regard to that claim, also, the court of appeals determined that Petitioner had failed to develop the factual predicate. Petitioner has not developed the claim any further in this Court.

> and the photo of Adams's cars, but the trial court excluded the evidence because Bogseth's lawyer failed to timely disclose the evidence and could not offer a proper foundation for admitting the documents or photos. Nevertheless, even if Bogseth's lawyer's handling of this evidence could be said to have fallen below an objective standard of reasonableness under prevailing professional norms, Bogseth has not shown that his lawyer's conduct prejudiced his trial. *Gioglio*, 296 Mich App at 22.
>
> Adams testified about the media posts and photo outside the presence of the jury. She explained that her posts were an angry response prompted by her belief that Kim had run off with a trucker. The evidence that she was responding angrily to what she then believed and that she came to those beliefs as a result of posts that did not appear to have been sent by Kim gave rise to an inference that she did not have anything to do with Kim's disappearance. Indeed, the evidence suggested that she had been duped. Likewise, Adams testified that she was upset with Kim at the time because she had been led to believe that Kim abandoned her family. She explained that she came to that conclusion after a Facebook post on Kim's Facebook page. She testified further that she did not think the post was by Kim. As such, the proposed evidence would not have furthered Bogseth's defense and may in fact have favored the prosecution's theory that Bogseth was trying to cover up Kim's murder by September 2, 2015. On this record, Bogseth has not shown that his lawyer's failure to admit this evidence prejudiced his trial. *Gioglio*, 296 Mich App at 22.
>
> Adams similarly stated that she owned lots of vehicles, and there was no indication that the Walmart footage could have conclusively established that Adams's car was at the Walmart parking lot when a witness claimed to have seen someone who looked like Kim. Bogseth's lawyer apparently felt that the black car depicted in the photo looked similar to a black car in the Walmart parking lot. Adams, however, stated that the car in the picture from her home was used in Chicago 95% of the time. Therefore, even if Bogseth's lawyer's handling of this evidence could be said to have fallen below an objective standard of reasonableness under prevailing professional norms, any error did not prejudice Bogseth's trial. *Id*.

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1727.)[9]

The fact that Petitioner's counsel was not able to introduce the Facebook posts does not mean that Adams did not testify regarding the events between the victim's disappearance and the

[9] Although the court of appeals' analysis and Petitioner's argument suggest that Petitioner's counsel failed to admit a photograph of Adams's vehicles, that is not accurate. Adams testified regarding the photograph and the vehicles, and the photograph was admitted into evidence. (Trial Tr. IV, ECF No. 14-10, PageID.1448–1450.)

discovery of her body. (Trial Tr. IV., ECF No. 14-10, PageID.1418–1477.) She offered testimony that made clear to the jurors that, after the victim disappeared, Adams believed that the victim had simply abandoned her husband, child, and friend. In fact, Adams indicated that she was angry with the victim, to the point of kicking the victim out of the house, because of the affair with Brink. She also indicated that she attempted to assist Petitioner in obtaining legal assistance to secure custody of his child.

Although counsel could not bolster that testimony with exhibits documenting Facebook postings, he was able to ask what was communicated and succeeded in conveying to the jurors Adams's support of Petitioner and her honest belief that the victim might have fled and had in fact fled. But no matter what Adams may have believed for those few days in September of 2015, she no longer believed it at the time of Petitioner's trial. And that was made abundantly clear in Adams's testimony on direct and cross-examination. That change of heart essentially obliterated the evidentiary value of statements made in September of 2015, statements that were based on what she described as a mistaken belief. The court of appeals' determination that Petitioner could not show prejudice—that the Facebook postings would not have changed the result—is well supported by the record. And the court of appeals' further determination that Petitioner's ineffective assistance claim was meritless absent some showing of prejudice is entirely consistent with *Strickland*.

### F. Failure to suppress evidence

Petitioner's suppression claim consists of the following:

> [T]rial counsel had to know there were issues with evidence taken without proper warrants, signs of evidence tampering which is clear in the trial record when officers were questioned about dates on evidence seals, and affidavit issues for search warrants and more importantly the affidavit for petitioner's arrest warrant.

(Pet., ECF No. 1-1, PageID.29.)  Tracking back to Petitioner's state appellate pleadings, only the "arrest warrant" portion of this claim was raised in the Michigan Court of Appeals on direct appeal.  (Pet'r's Pro Per Supp. Br., ECF 14-14, PageID.1879) ("Defendant's Counsel failure to raise the due process violation and challenge the legality of the arrest warrant which was issued and served for the open murder of Kimberly Bogseth 4 days prior [to] positive identification.").  The other issues appear for the first time in Petitioner's application for leave to appeal to the Michigan Supreme Court.  (Pet'r's Appl. for Leave to Appeal, ECF No. 14-16, PageID.2252–2257.)  But they appear as challenges to the warrants, not as evidence tampering claims and not as ineffective assistance claims.  The application includes an ineffective assistance claim relating to the arrest:  "Counsel should have challenged the legality of the arrest of Mr. Bogseth.  The due process violation of being arrested for the open murder of Kimberly Bogseth prior [to] being positively identified should have been addressed and challenged."  (*Id.*, PageID.2266.)  Petitioner's motion for relief from judgment, and subsequent appeals, raised the improper arrest warrant claim, but this time the claim is raised as a foundation for challenging the extradition.  (Pet'r's Appl. for Leave to Appeal, ECF No. 14-15, PageID.1951–1959.)  It was not raised as an ineffective assistance of counsel claim.

Sifting through all of Petitioner's submissions in this Court and the state courts reveals that the only statement of Petitioner's evidence tampering claim is the language quoted above: "signs of evidence tampering which is clear in the trial record when officers were questioned about dates on evidence seals . . . ."  (Pet., ECF No. 1-1, PageID.29.)  The Court has reviewed the entire transcript of the trial.  Although there were questions relating to the bag containing the envelope containing the phone, there was nothing that looked like evidence tampering.  Accordingly, the Court concludes that Petitioner has failed to demonstrate that his counsel was

professionally unreasonable for failing to object to evidence tampering, or that Petitioner suffered any prejudice as a result.

Petitioner's other claims—challenging the arrest warrant and his extradition—fare no better. The Michigan Court of Appeals addressed those claims as follows:

> Finally, Bogseth argues that his lawyer's failure to challenge his allegedly illegal arrest and extradition from Illinois amounted to ineffective assistance. Even assuming that his arrest and extradition were unlawful, Bogseth has not established a right to relief. Our Supreme Court has explained that "a court's jurisdiction to try an accused person cannot be challenged on the ground that physical custody of the accused was obtained in an unlawful manner." *People v Burrill*, 391 Mich 124, 133; 214 NW2d 823 (1974). Rather, due process is satisfied when the accused has been convicted after having been fairly apprised of the charges against him or her and after having had a fair trial in accord with constitutional procedural safeguards. *Id*. Because Bogseth has not shown that he did not receive a fair trial, he is not entitled to any relief.

(Mich. Ct. App. Op., ECF No. 14-14, PageID.1728.) In short, the challenge urged by Petitioner—a claim that the court lacked jurisdiction to try Petitioner because of alleged flaws in the initial arrest warrant or extradition—is meritless. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley*, 706 F.3d at 752.

### G. Failure to impeach witnesses Verity, Evans, or Brink

Petitioner notes that Evans—Petitioner's housemate—and Brink "were known to be career criminals." (Pet., ECF No. 1-1, PageID.27.) Moreover, Petitioner claims Evans "suffers from a mental disorder." (*Id.*) Petitioner complains that his counsel failed to exploit these facts to impeach the credibility of Evans or Brink.

Neither Brink nor Evans offered testimony that was particularly inculpatory. Petitioner does not explain how challenging the credibility of Evans or Brink would have enhanced Petitioner's defense. No witness could or did testify regarding what happened in the moments preceding, during, or immediately after the victim's death. Brink and Evans provided testimony regarding events that preceded or followed the criminal acts by hours or days.

Brink carried on an affair with the victim and discovered her body.  (Trial Tr. II, ECF No. 25-1, PageID.2586–2633.)  Those facts were undisputed.  And those facts also served as the foundation for the defense suggestion that Brink was responsible for her disappearance and murder.

Evans lived with Petitioner for a few weeks prior to the victim's disappearance.  (*Id.*, PageID.2658–2716.)  Much of his testimony was entirely consistent with the defense theory of the case.  The most significant impact of Evans's testimony related to the night Petitioner discovered the victim's purse in Brink's yard.  That night, Evans saw someone matching Petitioner's height running through his moonlit backyard wearing the same type of shirt Petitioner had been wearing.[10]  Through cross-examination, counsel suggested it might have been Brink or Brink's son.

Evans also testified that someone in the house had used too much bleach in the washing machine and that some of his family's clothing was damaged as a result.[11]  During cross-examination, Evans also suggested that the bleaching—or over-bleaching—might have occurred at Evans's own suggestion to help Petitioner's infant son get over the absence of the victim by removing her scent from his bedding.  Nonetheless, Evans's testimony regarding those events also fit the prosecutor's theory of Petitioner trying to cover his tracks and pin the blame on Brink.

Petitioner did not raise these issues quite the same way during his state court appeals.  There he focused on the prosecutor's failure to provide the criminal records of Evans and Brink,

---

[10] Evans's wife Jodi testified regarding the events of that night as well.  (Trial Tr. II, ECF No. 25-1, PageID.2728–2729.)  Although she did not see the person running through the yard, she confirmed that Evans said that he did and reacted accordingly.  Moreover, Jodi Evans also indicated that her four-year-old son also said he saw someone run through the yard.

[11] Evans's wife also corroborated his testimony regarding the bleach.  (Trial Tr. II, ECF No. 25-1, PageID.2724–2725.)

rather than counsel's failure to use those records to impeach Evans or Brink. (Pet'r's *Pro Per* Suppl. Br., ECF No. 14-14, PageID.1878–1879.) Ultimately, other than Petitioner's statement that both men were "known to be career criminals" and his contention that Evans suffers from a mental disorder, there is nothing in the record to indicate that there was anything for counsel to exploit. Thus, not only is it difficult to see how calling into question the credibility of Evans or Brink would have aided Petitioner's defense, but it is also impossible to determine whether evidence regarding the criminal histories of Evans and Brink or the mental health status of Evans would have had any impeaching impact on their testimony.

The Michigan Court of Appeals did not address this ineffective assistance of counsel argument because Petitioner only raised the issue in the form of a prosecutorial misconduct claim. The appellate court's resolution of that claim hinged on Petitioner's failure to demonstrate that the prosecutor did not produce the criminal records of Evans and Brink. That resolution does not suffice to address the related ineffective assistance of counsel claim. Accordingly, the Court addresses that claim *de novo*.

Petitioner has failed to establish the factual predicate for his claim. He has not demonstrated what the criminal records or mental health records might have shown regarding the credibility of Brink or Evans. Moreover, he has not demonstrated that those records would have impeached the testimony of either Brink or Evans. Accordingly, Petitioner has provided no basis to conclude that counsel's performance fell below an objective standard of reasonableness.

And even if Petitioner could show that the relevant records would have rendered the credibility of Evans or Brink questionable, Petitioner has not shown how failing to question that credibility would have aided his defense in any way. The important facts elicited from Brink were that Brink and the victim had an affair and that Brink found the victim's body. Neither of

those facts was disputed.  The key testimony from Evans—testimony regarding a person running through the yard the night the victim's purse was found near Brink's home and bleach—may not have been undisputed, but it was well-corroborated.

Petitioner also claims that his counsel failed to impeach Verity.  Petitioner contends that counsel could have impeached this witness with testimony from her boyfriend, who did not believe her, and with her drug use, which Petitioner states she admitted in an interview with police.  (Pet., ECF No. 1-1, PageID.26–27.)  The Court has carefully reviewed the arguments Petitioner raised in the Michigan courts.  It appears that he raises this issue for the first time here.

Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275–77 (1971); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *O'Sullivan*, 526 U.S. at 845; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  Petitioner has not presented his claim relating to the failure to impeach Wednesday Verity to all levels of the state courts.

Although the habeas statute does not allow the Court to grant relief absent exhaustion, 28 U.S.C. § 2254(b)(1), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

State." 28 U.S.C. § 2254(b)(2). Because this claim lacks merit, the Court will deny relief even though Petitioner may not have exhausted his state court remedies.

Petitioner complains that counsel failed to impeach Verity with her drug use or with further testimony from Verity's boyfriend that he did not believe she was being truthful. Petitioner does not provide a factual predicate for either means of impeachment. Petitioner offers nothing other than his say-so to support the claim that Verity used drugs. He suggests that fact was made plain by her interviews with police, but he does not supply the reports and offers no particulars regarding the nature of Verity's purported drug use. During Verity's testimony, she suggested that she was "a little bit of a party animal" but the testimony went no further than that. (Trial Tr. II, ECF No. 25-1, PageID.2561.) The same is true for Petitioner's claim that Verity's boyfriend did not believe her. There is nothing in the record to support that claim.

It simply does not matter whether Petitioner's claim regarding Verity's boyfriend is true because the boyfriend's opinion testimony regarding the credibility of Verity's testimony would not be admissible:

> It is "[t]he Anglo–Saxon tradition of criminal justice . . . [that] makes jurors the judges of the credibility of testimony offered by witnesses." *United States v. Bailey*, 444 US 394, 414, 100 S Ct 624, 62 L Ed 2d 575 (1980). Because it is the province of the jury to determine whether "a particular witness spoke the truth or fabricated a cock-and-bull story," *id*. at 414–415, 100 S Ct 624, it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial. *People v. Buckey*, 424 Mich 1, 17, 378 NW2d 432 (1985). See also, *People v. Peterson*, 450 Mich 349, 352, 537 NW2d 857 (1995). Such comments have no probative value, *Buckey*, 424 Mich at 17, because "they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *Connecticut v. Taft*, 306 Conn 749, 764, 51 A3d 988 (2012) (citation and quotation marks omitted). See also, *People v. Row*, 135 Mich 505, 507, 98 NW 13 (1904) (explaining that opinion testimony regarding a complainant's veracity is not competent evidence). As a result, such statements are considered "superfluous" and are "inadmissible lay witness [ ] opinion on the believability of a [witness's] story" because the jury is "in just as good a position to evaluate the

> [witness's] testimony." *People v. Smith*, 425 Mich 98, 109, 113, 387 NW2d 814 (1986).

*People v. Musser*, 835 N.W.2d 319, 327 (Mich. 2013) (footnote omitted). Therefore, it would neither have been professionally unreasonable to forego eliciting that testimony nor prejudicial to Petitioner's defense in any way.

As to Verity's purported drug use, it is possible that drug use might have impacted the credibility of her testimony; but Petitioner has not provided any factual foundation for assessing the impact. Petitioner offers no clue as to what drugs Verity might have used or when she might have used them. Certainly, if Verity was affected by hallucinogens during her alleged September conversation with Petitioner, that might impeach her testimony. But if she occasionally used marijuana, the drug use would likely not impeach her testimony at all. It is Petitioner's burden to demonstrate that his counsel rendered ineffective assistance. He has not met that burden with respect to counsel's failure to impeach Verity by questioning her about drug use.

Petitioner has not shown that counsel's failure to impeach Brink with his criminal record, Evans with his mental health status and criminal record, or Verity with her purported drug use was professionally unreasonable or of any consequence to the result. Accordingly, Petitioner is not entitled to habeas relief under *Strickland*.

**H. Failure to obtain documents through discovery**

Finally, Petitioner claims that his trial counsel rendered ineffective assistance because counsel failed to obtain documents through discovery. (Pet., ECF No. 1-1, PageID.29.) This claim parallels Petitioner's contention that the prosecutor committed misconduct by failing to provide the same documents during discovery. *See* § V.B.1. above. Petitioner's prosecutorial misconduct claim failed because the court of appeals determined that the prosecutor provided all of the discovery that Petitioner was due. As noted above, that determination is presumed correct.

Petitioner can only overcome that presumption with clear and convincing evidence. Petitioner offers no evidence at all. The court of appeals' unrebutted factual determination that the prosecutor provided all of the discovery materials that were due forecloses Petitioner's claim that counsel failed to obtain documents through discovery. Accordingly, Petitioner is not entitled to habeas relief on this ineffective assistance of counsel claim.

**VII. Discovery and an evidentiary hearing**

Early in these proceedings, Petitioner sought discovery and an evidentiary hearing. (ECF No. 2.) The Court denied relief because the request was premature. (Order, ECF No. 5.) After Respondent provided the record, Petitioner renewed his request for a hearing. (Mot., ECF No. 15.) After reviewing the entire state court record, the Court concludes that the record is adequate to permit resolution of all of Petitioner's claims without discovery or an evidentiary hearing. Therefore, Petitioner's motion for an evidentiary hearing (ECF No. 15) will be denied.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, I have examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims

debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that jurists of reason could . . . conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

Moreover, although the Court concludes that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

For the foregoing reasons, the Court denies the habeas petition and a certificate of appealability. The Court also denied Petitioner's motion for an evidentiary hearing. Finally, the Court declines to certify that an appeal would not be taken in good faith.

Dated: January 4, 2022

/s/ Sally J. Berens
SALLY J. BERENS
United States Magistrate Judge